**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-13610
Non-Argument Calendar
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

WASHINGTON FRANCISCO MERO-MERO,
JUAN CARLOS MARIN-MERO,
ANTHONY BRYAN MERO-MERO,

*Defendants-Appellants.*

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:23-cr-20477-JB-1
_____

Before ROSENBAUM, GRANT, and HULL, Circuit Judges.

PER CURIAM:

After a stipulated bench trial, Defendants Washington Mero-Mero, Juan Carlos Marin-Mero, and Anthony Mero-Mero appeal their drug convictions under the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70503(a)(1), 70506(b). Collectively, they argue (1) the MDLEA is unconstitutional; and (2) the indictment should have been dismissed for violations of Federal Rule of Criminal Procedure 5. Separately, Anthony Mero-Mero challenges his sentence and argues the district court erred in denying a minor-role decrease to his offense level under U.S.S.G. § 3B1.2(b).

After careful review, we affirm in all respects.

## I.  FACTUAL BACKGROUND

### A.    Offense Conduct

At a bench trial, the parties stipulated to these facts. In November 2023, the United States Coast Guard ("Coast Guard") detected a "go-fast vessel" operating in the Pacific Ocean around 196 nautical miles off the coast of Ecuador. The go-fast vessel had (1) three people on board; (2) a deck covered in fuel barrels and packages; and (3) no indication of its nationality. True to its name, the go-fast vessel was operating at a high rate of speed in a known drug trafficking area.

The Coast Guard diverted a nearby ship, the USCGC *Waesche* (the "*Waesche*"), to pursue the suspicious craft and perform a right-of-visit boarding. A small boat and boarding team were launched from the *Waesche* to further the pursuit. The pilot of the go-fast vessel initially refused to stop his craft, causing Coast

Guard personnel to fire warning shots near the vessel. Thereafter, the go-fast vessel stopped, and Coast Guard personnel gained control of the vessel.

Three Ecuadorian nationals—the three defendants here—were on board the go-fast vessel: Washington Francisco Mero-Mero, Juan Carlos Marin-Mero, and Anthony Bryan Mero-Mero. Washington Mero-Mero identified himself as the vessel's master and claimed the vessel was of Ecuadorian nationality. The Coast Guard contacted Ecuador's government, who responded that it "could neither confirm nor deny the nationality of the vessel." Therefore, the go-fast vessel was treated as a "vessel without nationality," 46 U.S.C. § 70502(d)(1)(C), and Coast Guard personnel boarded the vessel.

Coast Guard personnel recovered thirty-nine bales of suspected drugs from the go-fast vessel. The bales field tested positive for cocaine. Subsequent lab testing confirmed that the bales contained 1,147 kilograms of cocaine. The cocaine bales and Defendants were transferred to the *Waesche*.

## B.    Transport to the United States

At a separate evidentiary hearing, the government introduced the testimony of Coast Guard Lieutenant Peter Hutchison, who described Defendants' transport to the United States. Hutchison was not involved in Defendants' interdiction, but prepared to testify by reviewing the "case package" prepared by other Coast Guard personnel.

On November 16, 2023, the Coast Guard stopped the go-fast vessel and detained Defendants aboard the *Waesche*. At that point, the *Waesche* and its detainees were 2,700 nautical miles from San Diego, California—the Coast Guard's nearest offload point for its ships in the Pacific Ocean.

The following day, November 17, the Coast Guard submitted a "request for disposition" to Coast Guard headquarters, which passed the request to the Department of Justice. While the Coast Guard crew awaited a response, they continued their drug interdiction operations aboard the *Waesche* but began to move northward, towards San Diego.

Also on November 17, Defendants were temporarily transferred to the USCGC *Northland* so the *Waesche* could refuel in Ecuador. Hutchison guessed that transferring Defendants to other ships during brief stops or moorings was intended to allow the Coast Guard to continue moving detainees "further towards their end destination." On November 18, the *Waesche* refueled, and Defendants were transferred back to that ship the next day.

On November 20, a response to the request for disposition was received and indicated Defendants would be prosecuted in the Southern District of Florida.[1] That same day, Coast Guard crew

---

[1] On appeal, Defendants do not raise any venue issues. For offenses "not committed within any State," the Constitution allows Congress to set venue by statute. U.S. Const. art. III, § 2, cl. 3. The MDLEA contains its own venue provision, which in relevant part allows defendants who commit an offense "upon the high seas" to be "tried in any district." 46 U.S.C. § 70504(b)(2).

aboard the *Waesche* captured a semi-submersible vessel carrying four smugglers and 2,510 kilograms of cocaine.

On November 24, the *Waesche* transferred its detainees to the USCGC *Active*. The *Waesche* refueled in Guatemala and moored in Mexico for several days to replenish supplies. On November 30, the *Waesche* rendezvoused with the USCGC *Active,* took aboard Defendants and other detainees, then continued towards San Diego. The *Waesche* arrived in San Diego on December 6, 2023—twenty days after Defendants were captured on November 16.

Lieutenant Hutchison testified that a ship like the *Waesche* generally traveled around 12 to 15 knots. But he noted that logs for the *Waesche* contained entries indicating the ship sometimes slowed to 3.5 knots. Hutchison calculated that a ship traveling at an average speed of 10 knots would have taken twelve to fifteen days to travel from Defendants' point of capture to the Coast Guard port in San Diego.

Lieutenant Hutchison also testified regarding the conditions of Defendants' detention while in transport to San Diego. Hutchison said there was no evidence that Defendants were interrogated by Coast Guard personnel. Hutchison also described general Coast Guard detention policies, under which Defendants would receive (1) medical care; (2) clean garments and toiletries; (3) shower and bathroom access; (4) meals identical to those provided to the ship's crew; and (5) a sheltered holding area.

6                    Opinion of the Court                 24-13610

Hutchison acknowledged Defendants were likely shackled a majority of the time they were aboard Coast Guard ships.

## II.  PROCEDURAL HISTORY

### A.    Criminal Complaint, Interview, and Initial Appearance

On December 1, 2023, a criminal complaint was filed against Defendants in the Southern District of Florida.

On December 6, Homeland Security Agent Vincent Knoll met the three Defendants when they arrived in San Diego. Knoll conducted an interview after Defendants were provided *Miranda*[2] warnings and waived their rights.

On December 7, 2023—21 days after their capture at sea—Defendants made their first appearance before a magistrate judge in the Southern District of California.

### B.    Indictment

An indictment in the Southern District of Florida charged Washington Mero-Mero, Juan Carlos Marin-Mero, and Anthony Mero-Mero each with (1) conspiring to possess with intent to distribute a controlled substance while on board a vessel subject to the jurisdiction of the United States, in   violation of 46 U.S.C. §§ 70503(a)(1), 70506(b) ("Count 1"); and (2) the substantive count of possessing with intent to distribute a controlled substance while on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. § 70503(a)(1) and 18 U.S.C. § 2 ("Count 2").

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Both counts alleged the offense involved five kilograms or more of cocaine, under 46 U.S.C. § 70506(a) and 21 U.S.C. § 960(b)(1)(B)(ii).

## C.    Motion to Dismiss the Indictment

Defendants jointly moved to dismiss the indictment for three independent reasons. First, Defendants argued the MDLEA was unconstitutional as applied to their conduct in Ecuador's Exclusive Economic Zone ("EEZ"). Defendants highlighted that the Felonies Clause of the U.S. Constitution provided Congress the power to "define and punish . . . Felonies committed on the high Seas." U.S. Const. art. I, § 8, cl. 10. Defendants, however, said Ecuador's EEZ was not the high seas as those areas are defined by international law.

Second, Defendants argued the MDLEA was unconstitutional to the extent it applied to "vessel[s] without nationality" defined as "a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." *See* 46 U.S.C. §§ 70502(c)(1)(A), (d)(1)(C), 70503. Defendants said the MDLEA definition went beyond international law's definition of a "stateless vessel" and impermissibly displaced the international law principle that a verbal claim of nationality was prima facie proof of a vessel's nationality.

Third, Defendants argued the indictment was due to be dismissed as a sanction for the government's alleged violations of Federal Rule of Criminal Procedure 5. Defendants asserted the

government failed to (1) "take the defendant[s] without unnecessary delay before a magistrate judge," *see* Fed R. Crim. P. 5(a)(1)(b); and (2) promptly file a criminal complaint against the defendants, *see id.* R. 5(b). Even if the district court did not dismiss the indictment for the Rule 5 violations, Defendants alternatively asked that their post-arrest statements be suppressed.

The government opposed Defendants' motion.

### D.    Evidentiary Hearing and Order on Motion to Dismiss

The district court held an evidentiary hearing on Defendants' motion to dismiss. As summarized above, Coast Guard Lieutenant Hutchison testified regarding Defendants' transport to the United States. *See supra* Section I.B. Homeland Security Agent Vincent Knoll also testified and briefly described meeting Defendants in San Diego, conducting an interview, and drafting the criminal complaint.

In a written order, the district court denied Defendants' joint motion to dismiss the indictment. The district court ruled that both of Defendants' constitutional challenges failed because (1) this Court's decision in *United States v. Alfonso*, 104 F.4th 815 (11th Cir. 2024), held the MDLEA could constitutionally apply in another nation's EEZ; and (2) Defendants' vessel met the definition of a "vessel without nationality" and no court had ever held that definition unconstitutional.

The district court rejected Defendants' argument that the Coast Guard unnecessarily delayed their appearance before a magistrate judge. The district court credited Lieutenant

Hutchison's testimony that it would have taken a ship traveling at 10 knots around 12 to 15 days to reach San Diego from Defendants' point of capture. Defendants appeared before a magistrate judge twenty days after their capture. The district court attributed the roughly five day delay to the Coast Guard "continu[ing] its mission" and "balanc[ing] its responsibilities." The district court highlighted that the Coast Guard continuously moved Defendants north towards San Diego at around 142 nautical miles per day, faster than transport this Court found was not unreasonably delayed in a prior decision. *See United States v. Purvis*, 768 F.2d 1237, 1238-39 (11th Cir. 1985) (holding defendants' four-day transport to port from 350 miles out, at 87.5 miles per day pace, and appearance before magistrate judge the following day did not violate Rule 5).

## E.    Stipulated Bench Trial and Sentence

After waiving their right to a jury trial, the Defendants proceeded to a bench trial in which they stipulated to all relevant facts. The district court considered the stipulated facts and found each of the Defendants guilty on (1) the drug conspiracy in Count 1, and (2) the substantive drug offense in Count 2.

The district court sentenced all three Defendants to 78 months of imprisonment on each count, to run concurrently. Only Anthony Mero-Mero challenges his sentence.

All three Defendants timely appealed their convictions.

### III.  STANDARDS OF REVIEW

"We review the constitutionality of a statute that defines a criminal offense *de novo*." *United States v. Alsenat*, 174 F.4th 45, 46 (11th Cir. 2026).

We review the district court's denial of the motion to dismiss the indictment on non-constitutional grounds for abuse of discretion. *See Alfonso*, 104 F.4th at 820.

"We review *de novo* the interpretation and application of the Sentencing Guidelines." *United States v. Kluge*, 147 F.4th 1291, 1296 (11th Cir. 2025) (quoting *United States v. Dupree*, 57 F.4th 1269, 1272 (11th Cir. 2023) (en banc)). We review the district court's fact findings at sentencing under the clearly erroneous standard. *United States v. Bergman*, 852 F.3d 1046, 1070 (11th Cir. 2017).

### IV.  CONSTITUTIONALITY OF THE MDLEA

On appeal, all three Defendants challenge their indictments and convictions under the MDLEA as unconstitutional. Collectively, they argue the MDLEA exceeds Congress's Felonies Clause power to the extent it (1) was applied to their conduct within Ecuador's EEZ; and (2) defines "vessel without nationality" contrary to international law.[3] This Court's binding precedent forecloses both claims.

---

[3] On appeal, Washington Mero-Mero does not join his co-defendants in arguing the MDLEA's definition of "vessel without nationality" renders it unconstitutional.

A.    **Meaning of "High Seas"**

The "Felonies Clause" of the Constitution empowers Congress to "define and punish Piracies and Felonies committed on the high Seas." U.S. Const. art. I, § 8, cl. 10. Congress exercised its prerogative by passing the MDLEA. *See* 46 U.S.C. § 70501 *et seq.*

In relevant part, the MDLEA makes it illegal to "knowingly or intentionally . . . possess with intent to manufacture or distribute . . . a controlled substance on board a covered vessel." 46 U.S.C. § 70503(a)(1). The MDLEA expressly "applies even though the act is committed outside the territorial jurisdiction of the United States." *Id.* § 70503(b). The MDLEA can be constitutionally applied to vessels on the high seas even when those vessels lack a nexus to the United States. *See United States v. Campbell*, 743 F.3d 802, 809-10 (11th Cir. 2014). The MDLEA cannot be constitutionally applied, however, to conduct in another State's territorial waters. *See United States v. Davila-Mendoza*, 972 F.3d 1264, 1268 (11th Cir. 2020) (citing *United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1258 (11th Cir. 2012)).

Here, Defendants were arrested in what international law defines as Ecuador's EEZ—the area extending "beyond the territorial sea but within 200 nautical miles of [Ecuador's] coastal baseline." *Daniels v. Exec. Dir. of Fla. Fish & Wildlife Conservation Comm'n*, 127 F.4th 1294, 1300 n.2 (11th Cir. 2025). Defendants urge that their arrest in Ecuador's EEZ means they were not on the "high seas" within the meaning of the Felonies Clause, pursuant to which Congress passed the MDLEA.

This Court rejected an argument identical to that of Defendants' in *Alfonso*. 104 F.4th at 824-27. There, the Coast Guard interdicted a go-fast vessel and arrested its crew within the Dominican Republic's EEZ. *Id.* at 819. In their subsequent prosecution, the *Alfonso* defendants argued the MDLEA was unconstitutional as applied because they were arrested in the EEZ, not the "high seas" as defined by international law. *Id.* The *Alfonso* Court held that "the EEZ is part of the 'high seas' and thus within Congress's authority under the Felonies Clause." *Id.* at 818. Moreover, this Court said the Felonies Clause, including its "high seas" language, "is not limited by customary international law." *Id.* at 826; U.S. Const. art. I, § 8, cl. 10. This Court has since rejected similar constitutional challenges by defendants interdicted in other States' EEZs as foreclosed by *Alfonso*. *See, e.g.*, *United States v. Canario-Vilomar*, 128 F.4th 1374, 1380-81 (11th Cir. 2025); *United States v. Martinez*, 172 F.4th 1306, 1311-12 (11th Cir. 2026).

"In the Eleventh Circuit, a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *Chemaly v. Lampert*, 174 F.4th 843, 851 (11th Cir. 2026) (citation modified).

Washington Mero-Mero and Juan Carlos Marin-Mero try to distinguish *Alfonso* to avoid its application to this case.[4] These two defendants point out that they are Ecuadorian citizens who were

---

[4] Anthony Mero-Mero seemingly accepts that *Alfonso* controls and merely challenges application of the MDLEA "for purposes of further review."

arrested in Ecuador's EEZ. In their view, *Alfonso* did not address application of the MDLEA against defendants within the EEZ of their country of citizenship and "[t]he United States should not extend its jurisdictional reach to a citizen present in waters subject to his own country's sovereignty."

Washington Mero-Mero and Juan Carlos Marin-Mero's attempt to distinguish *Alfonso* falls flat. Nothing about a defendant's nationality changes the textual interpretation of "high seas," U.S. Const. art. I, § 8, cl. 10, that we set forth in *Alfonso*. *Alfonso*, 104 F.4th at 818-26. And, in any event, we cannot avoid application of a prior panel's decision because of a possible "overlooked reason" for a different result. *See In re Lambrix*, 776 F.3d 789, 794 (11th Cir. 2015) ("[W]e have categorically rejected an overlooked reason or argument exception to the prior-panel-precedent rule.").

At bottom, *Alfonso* controls and requires that we hold the MDLEA can be constitutionally applied to Defendants' conduct in Ecuador's EEZ.

## B.    Vessel Without Nationality

As we have said, the MDLEA applies to "covered vessel[s]." 46 U.S.C. § 70503(a). Covered vessels include, in relevant part, a "vessel subject to the jurisdiction of the United States." *Id.* § 70503(e)(1). A "vessel subject to the jurisdiction of the United States," in turn, includes "a vessel without nationality." *Id.* § 70502(c)(1)(A). As happened here, a vessel is considered to be without nationality when the master of the vessel "makes a claim of registry and for which the claimed nation of registry does not

affirmatively and unequivocally assert that the vessel is of its nationality." *Id.* § 70502(d)(1)(C).

Defendants do not dispute they were arrested aboard a "covered vessel" as defined by the MDLEA. As they stipulated, Washington Mero-Mero identified himself as the master of the go-fast vessel and claimed Ecuadorian nationality for the vessel. Ecuador, however, "could neither confirm nor deny the nationality of the vessel," making § 70502(d)(1)(C) plainly applicable.

Instead, Juan Carlos Marin-Mero and Anthony Mero-Mero argue that the MDLEA's definition of "a vessel without nationality" conflicts with the meaning of "stateless vessel" under international law and, thereby, exceeds Congress's power under the Felonies Clause. That argument is foreclosed by our binding precedent in *Canario-Vilomar*.

In *Canario-Vilomar*, this Court considered the defendants' argument that "the MDLEA's definition of a vessel without nationality—specifically, the inclusion of vessels for which a claimed nation can neither confirm nor deny registration—is ultra vires." 128 F.4th at 1381. The *Canario-Vilomar* Court reasoned that the MDLEA was repeatedly upheld as a constitutional exercise of Congress's authority under the Felonies Clause. *Id.* (first citing *United States v. Hernandez*, 864 F.3d 1292, 1303 (11th Cir. 2017); and then citing *United States v. Campbell*, 743 F.3d 802, 810 (11th Cir. 2014)). The Court further relied on *Alfonso*, reasoning: "[W]e held in *Alfonso* that 'the Felonies Clause is not limited by customary international law.' It follows that international law cannot limit

Congress's authority to define 'stateless vessel' for purposes of the MDLEA." *Id.* (quoting *Alfonso*, 104 F.4th at 826).

Consistent with *Canario-Vilomar* and our prior-panel-precedent rule, we hold the MDLEA's definition of "a vessel without nationality" and "covered vessel" is constitutional under the Felonies Clause.

## V.   FEDERAL RULE OF CRIMINAL PROCEDURE 5

Seeking to vacate their convictions, Washington Mero-Mero and Juan Carlos Marin-Mero argue the government violated Federal Rule of Criminal Procedure 5 by allowing unreasonable delays between their capture and (1) their appearance before a magistrate judge, and (2) the filing of a criminal complaint against them. We address each argument in turn.

### A.   Rule 5(a): Appearance Before a Magistrate Judge

Federal Rule of Criminal Procedure 5(a) provides: "A person making an arrest outside the United States must take the defendant without unnecessary delay before a magistrate judge, unless a statute provides otherwise." Fed. R. Crim. P. (5)(a)(1)(B). Rule 5(a) exists to "prevent oppressive police interrogations and other 'third-degree' tactics before bringing the accused in front of an officer of the court." *United States v. Hurtado*, 89 F.4th 881, 899 (11th Cir. 2023) (quoting *United States v. Cabezas-Montano*, 949 F.3d 567, 591 (11th Cir. 2020)).

To determine whether there has been "unnecessary delay" under Rule 5(a), we consider four "*Purvis* factors": (1) the distance between the location of the defendant's arrest and the U.S. port to which he was brought; (2) "the time between the defendant's arrival at the U.S. port and his presentment to the magistrate judge"; (3) "any evidence of mistreatment or improper interrogation during the delay"; and (4) any reason for the delay, such as exigent circumstances or emergencies. *Cabezas-Montano*, 949 F.3d at 591; *Purvis*, 768 F.2d at 1238-39.

The defendant bears the burden of showing that a delay was "unnecessary" under Rule 5(a). *Cabezas-Montano*, 949 F.3d at 592. To carry that burden, the defendant must "develop the factual predicates" for their claim and do more than rely on "pure speculation." *Id.* at 592 & n.20.

In this case, the *Purvis* factors amply support the district court's rejection of Defendants' Rule 5(a) argument. First, Defendants were arrested 2,700 nautical miles from the Coast Guard's nearest port for its Pacific operations, San Diego, California. The Coast Guard delivered Defendants to San Diego twenty days later. Compared to cases where this Court found no unnecessary delay in transport, Defendants here either spent less total time in transport or were transported to port at a greater rate of speed (135 nautical miles per day). *See Purvis*, 768 F.2d at 1238-39 (rejecting Rule 5(a) claim where defendants were transported 87.5 miles per day); *Cabezas-Montano*, 949 F.3d at 591-92 (rejecting Rule 5(a) claim where defendants' transport lasted forty-eight days); *see*

*also United States v. Odom*, 526 F.2d 339, 341, 343 (5th Cir. 1976) (rejecting unnecessary delay claim where defendant was transported forty miles per day).

Second, Defendants were presented to a magistrate judge one day after their arrival in San Diego. A one day or less gap between arrival in the United States and appearance before a magistrate judge is not unreasonable. *See Purvis*, 768 F.2d at 1239; *Hurtado*, 89 F.4th at 898. Washington Mero-Mero and Juan Carlos Marin-Mero have offered no evidence they could have appeared before a magistrate judge sooner.

Third, there is no evidence Defendants were subjected to mistreatment or improper interrogation during their transport to San Diego. To the contrary, Lieutenant Hutchison testified that Defendants were not interrogated. He further testified that the Coast Guard's standard policy was to provide detainees medical care, clean garments and toiletries, shower and bathroom access, meals identical to those provided to the ship's crew, and a sheltered holding area. No evidence suggests these detention policies were not followed here.

Fourth, the record contains ample reason for the twenty-one days passing between Defendants' capture and their presentment. As Lieutenant Hutchison testified, a Coast Guard cutter traveling at an average speed of 10 knots would have taken twelve to fifteen days to travel from Defendants' point of capture to the Coast Guard port in San Diego. So, like *Purvis*, "a large part of the delay was necessitated by the fact that the arrest was made so far from

18                    Opinion of the Court                    24-13610

port on the high seas." 768 F.2d at 1239. And some delay was due to the Coast Guard continuing its drug interdiction mission and, indeed, interdicting another vessel carrying 2,510 kilograms of cocaine. *See id.* (finding no unnecessary delay despite fact that Coast Guard "continued its normal law enforcement patrolling activities" rather than proceeding directly to port).[5] Defendants were transported to port reasonably quickly, and the "delay here had nothing to do with extracting a confession." *Hurtado*, 89 F.4th at 899.

Washington Mero-Mero and Juan Carlos Marin-Mero fault the district court for relying on Lieutenant Hutchison's testimony, since Hutchison was not directly involved in Defendants' capture or transport. Yet, Lieutenant Hutchison was competent to testify to the contents of Coast Guard records and the Coast Guard's general procedures. The Defendants' argument that "[n]o evidence was provided by the [g]overnment that refuted the claims that the delay was unreasonable" ignores that it was Defendants' burden to produce evidence to support their Rule 5(a) claim. *See Cabezas-Montano*, 949 F.3d at 592. They have not done so here.

---

[5] For similar reasons, we summarily reject Juan Carlos Marin-Mero's suggestion that the Coast Guard should have transported Defendants directly to Miami, which would have resulted in a shorter transport. We decline to hold that a Pacific-based Coast Guard ship had to cease completely its mission and depart its area of operation to shorten Defendants' transport by an unspecified amount of time.

## B.    Rule 5(b): Filing of Criminal Complaint

Federal Rule of Criminal Procedure 5(b) provides: "If a defendant is arrested without a warrant, a complaint meeting Rule 4(a)'s requirement of probable cause must be promptly filed in the district where the offense was allegedly committed." Fed. R. Crim. P. 5(b).

For the same reasons Defendants did not show an unnecessary delay in their presentment before a magistrate judge, we conclude Washington Mero-Mero and Juan Carlos Marin-Mero have not established a Rule 5(b) violation. The government filed a criminal complaint in the Southern District of Florida on December 1, 2023—fifteen days after their capture, but six days before their presentation to a magistrate judge. Under the circumstances of this case, the criminal complaint was promptly filed.[6]

## VI.  SENTENCING CHALLENGE

Anthony Mero-Mero alone challenges his sentence, arguing the district court clearly erred by denying him a two-level minor role reduction under U.S.S.G. § 3B1.2(b), which also would have lowered his base offense level. Ultimately, we affirm Anthony Mero-Mero's sentence.

---

[6] The government argues Rule 5(b) does not apply to MDLEA defendants arrested on the high seas. This Court has never held to that effect in a published opinion, and we need not decide the issue today.

## A.      Presentence Investigation Report

A probation officer prepared a presentence investigation report ("PSI") using the 2023 Sentencing Guidelines Manual.

The PSI calculated a total offense level of 31, consisting of: (1) a base offense level of 38 because the offense involved 450 kilograms or more of cocaine, pursuant to U.S.S.G. § 2D1.1(a)(5), (c)(1); (2) a two-level decrease because Anthony Mero-Mero qualified for § 5C1.1 "safety-valve relief," pursuant to U.S.S.G. § 2D1.1(b)(18); (3) a two-level decrease for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a); (4) an additional one-level decrease for Mero-Mero timely notifying the government of his intent to plead guilty, pursuant to U.S.S.G. § 3E1.1(b); and (5) a two-level decrease because Anthony Mero-Mero qualified as a "zero-point offender," pursuant to U.S.S.G. § 4C1.1(a). With a total offense level of 31 and a criminal history category of I, the PSI calculated Anthony Mero-Mero's advisory guidelines imprisonment range to be 108 to 135 months.

As relevant here, all three Defendants objected to the PSI's failure to apply a two-level minor role decrease under § 3B1.2(b). Defendants contended that sustaining their objections would trigger § 2D1.1(a)(5), which lowers a defendant's base offense level in drug cases when a minor role decrease under § 3B1.2(b) applies. In his case, Anthony Mero-Mero explained that § 2D1.1(a)(5) would lower his base offense level to 34. Along with the § 3B1.2(b) two-level decrease and his existing decreases, Anthony Mero-Mero

calculated that his total offense level should be 25, yielding an advisory guidelines range of 57 to 71 months of imprisonment.

The government responded to Defendants' objections and maintained that § 3B1.2(b)'s minor role decrease did not apply. The government reasoned that Defendants played comparable and essential roles in the crime charged in the indictment: conspiring to possess and possessing cocaine with intent to distribute while aboard a vessel subject to the jurisdiction of the United States. The government further reasoned that Defendants' culpability vis-à-vis unidentified manufacturers or owners of the cocaine was irrelevant and went beyond relevant conduct underlying their specific charges. In the government's words, Defendants were "figuratively, as well as literally, in the same boat, and none is less in it than the others."

## B.    Sentencing Hearing

At Defendants' joint sentencing hearing, the parties offered further argument on the applicability of § 3B1.2(b)'s minor role decrease. Anthony Mero-Mero argued that the cocaine recovered in this case was prepared and packaged by a large, multi-national drug trafficking organization ("DTO") wherein individuals other than Defendants (1) supplied a quantity of drugs; (2) chose the boat; (3) planned the route; (4) recruited Defendants; and (5) arranged for the drugs to be received and distributed. In comparison with others in the organization, Mero-Mero described himself and his co-defendants as (1) poor fishermen; (2) charged only with operating the go-fast vessel; (3) with zero ownership interest in the

cocaine; (4) possessing no decision making authority; and (5) on the whole, "less culpable than the average [DTO participant]."

The government responded by quoting this Court's statement that, "Only if the defendant can establish that [he] played a relatively minor role in the conduct for which [he] has already been held accountable—not a minor role in a larger criminal conspiracy—should the district court grant a downward adjustment for minor role in the offense." *United States v. Rodriguez De Varon*, 175 F.3d 930, 944 (11th Cir. 1999) (en banc). Thus, the government argued Defendants were casting the conspiracy too broadly, since Defendants were held responsible only for the drugs they were actually transporting. The government also pointed out that Defendants were recruited because of their skills as mariners and fishermen, which would allow them to repair the boat and navigate the seas.

The district court overruled Defendants' objections to the PSI. The district court agreed with the government "because [Defendants'] argument that they're a minor role in this bigger drug conspiracy is drawing that conspiracy too broadly." The district court pointed out that this case did not charge a larger conspiracy and defendants higher up in the DTO, but instead charged only Defendants' importation of around a thousand kilograms of cocaine. The district court acknowledged there likely were "bigger people" involved in the importation, but reasoned there was not "enough of a record to establish that [Defendants had] a minor role in the indictment as charged."

Having overruled Defendants' objections, the district court nonetheless found it appropriate to vary downward from the advisory guidelines range of 108 to 135 months of imprisonment. The district court sentenced Anthony Mero-Mero and each of his co-defendants to concurrent terms of 78 months of imprisonment on both Counts 1 and 2.

## C.    U.S.S.G. § 3B1.2(b)

U.S.S.G. § 3B1.2(b) provides for a two-level decrease of a defendant's total offense level "[i]f the defendant was a minor participant in any criminal activity." U.S.S.G. § 3B1.2(b) (2023).[7] "A minor participant is one 'who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal.'" *United States v. Gruezo*, 66 F.4th 1284, 1293 (11th Cir. 2023) (quoting U.S.S.G. § 3B1.2(b) cmt. n.5).

Applicability of a minor-role decrease depends on a review of the "totality of the circumstances." *United States v. Cruickshank*, 837 F.3d 1182, 1195 (11th Cir. 2016). The district court (1) "must measure the defendant's role against the relevant conduct for which [he] has been held accountable"; and (2) "may also measure the defendant's culpability in comparison to that of other participants in the relevant conduct." *Rodriguez De Varon*, 175 F.3d

---

[7] Generally, "we apply the version of the [Sentencing] Guidelines in effect at the time of the defendant's sentencing." *Martinez*, 172 F.4th at 1315. Here, the 2023 Sentencing Guidelines Manual applies.

at 940, 944. The defendant seeking a role decrease bears the burden of proving they played a minor role. *Id.* at 939.

The district court's denial of a minor role decrease is a factual determination we review for clear error. *See Cruickshank*, 837 F.3d at 1192.

## D.    Discussion

This Court has often affirmed the denial of minor role reductions for the crew of drug smuggling vessels. *See Cabezas-Montano*, 949 F.3d at 606-08; *Gruezo*, 66 F.4th at 1293-94; *Martinez*, 172 F.4th at 1314-15. In each of these cases, this Court reasoned that the defendants' illegal transportation of drugs was the exact conduct for which defendants were being held responsible, not some "minor role in [a] larger criminal conspiracy." *Cabezas-Montano*, 949 F.3d at 606-07 (quoting *Rodriguez De Varon*, 175 F.3d at 944); *Gruezo*, 66 F.4th at 1294; *Martinez*, 172 F.4th at 1315. And this Court has compared the defendant's culpability to that of his fellow crewmember co-defendants, not "the culpability of any <u>unknown</u> conspirators or a hypothetical conspiracy." *Cabezas-Montano*, 949 F.3d at 607-08; *Martinez*, 172 F.4th at 1315.

In light of the record and our above-cited precedent, the district court did not clearly err in denying Anthony Mero-Mero a minor role decrease under § 3B1.2(b). The district court properly considered Mero-Mero's role in his specific offense conduct: possessing (and conspiring to possess) with intent to distribute a controlled substance while aboard a vessel subject to the United

States's jurisdiction. As to that conduct, Mero-Mero played a "serious and important" role of transporting the contraband by sea. *Gruezo*, 66 F.4th at 1294.

We acknowledge Anthony Mero-Mero's argument that his offense involved other individuals such as (1) recruiters of individuals, like Defendants, to pilot the go-fast vessel; (2) owners of the narcotics and vessels; (3) organizers of the multi-step transport; and (4) receivers and distributors of the narcotics. But, as the district court pointed out, Anthony Mero-Mero offered no evidence to establish the role or relative culpability of these unidentified individuals. Thus, the district court properly focused on Defendants' actual conduct rather than the conduct of unknown individuals who were perhaps part of a broader criminal scheme. We cannot say the district court clearly erred in finding Anthony Mero-Mero did not qualify for a minor role decrease under § 3B1.2(b).

## VII.  CONCLUSION

We **AFFIRM** each of the Defendants' two MDLEA drug convictions and their 78-month sentences.

**AFFIRMED.**